IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 34375

| | | |
|---|---|---|
| IDAHO COUNTIES RISK MANAGEMENT PROGRAM UNDERWRITERS, | ) ) | |
| | ) | Boise, January 2009 Term |
| Plaintiff-Appellant, | ) | |
| | ) | 2009 Opinion No. 41 |
| v. | ) | |
| | ) | Filed: April 2, 2009 |
| NORTHLAND INSURANCE COMPANIES, a Minnesota corporation, | ) ) | Stephen Kenyon, Clerk |
| | ) | |
| Defendant-Respondent. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Honorable Darla Williamson, District Judge.

The decision of the district court is affirmed.

Anderson, Julian & Hull, Boise, for appellant. Phillip Collaer argued.

Hall, Farley, Oberrecht & Blanton, Boise, for respondent. Donald J. Farley argued.

---

HORTON, Justice

This case arises out of an insurance dispute. Idaho Counties Risk Management Program Underwriters (ICRMP) appeals the district court's grant of summary judgment in favor of ICRMP's insurer, Northland Insurance Companies (Northland), holding that Northland had no duty to reimburse ICRMP for costs it incurred on behalf of its insureds in the defense and settlement of a lawsuit filed by Donald M. Paradis. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 22, 1980, the bodies of Kimberly Palmer and Scott Currier were discovered in the woods outside of Post Falls, Idaho. Detective George Elliott transported Ms. Palmer's and Mr. Currier's bodies to Portland, Oregon, where the Chief Medical Examiner for the State of Oregon, William Brady, M.D., performed autopsies. The following day, June 24, 1980, a meeting was held with members from the Spokane County Sheriff's Office and the Kootenai County Sheriff's Office to discuss investigation of the killings. Kootenai County Deputy

-1-

Prosecuting Attorney D. Marc Haws also attended the meeting; his supervisor at the time, the prosecuting attorney, was Glen Walker. During the course of the meeting, Haws took notes that reflected his understanding of the murders.

In late 1980, Paradis was arrested and charged with the murder of Ms. Palmer, and the State presented its theory, based on the opinion of Dr. Brady and conveyed to the court through Haws, that Ms. Palmer had aspirated water from the creek near Post Falls in which her body was found partially submerged, suggesting that she had been alive when she went into the creek and was thus killed in Idaho. On December 10, 1981, following a trial conducted by Haws and another deputy Kootenai County prosecutor, Peter Erbland, Paradis was found guilty of first degree murder and sentenced to death.

Paradis sought review of his conviction by appeal, post-conviction relief, and federal habeas corpus. While one of his habeas petitions was pending in January 1996, Paradis' counsel obtained copies of the notes Haws had made during the June 24, 1980 meeting, which revealed significant inconsistencies in Dr. Brady's opinions the day after the autopsy as to the cause and location of Ms. Palmer's death and the opinions Dr. Brady offered at trial. While Paradis was awaiting trial in Kootenai County in 1980-1981, Paradis' attorney had made a routine request for disclosure, but the prosecutor did not reveal Haws' notes or any of the potentially exculpatory information in or related to them.

Eventually, Paradis' case went before the United States Court of Appeals for the Ninth Circuit, which held that the non-disclosure of this exculpatory evidence amounted to a violation of the prosecution's duty under *Brady v. Maryland*, 373 U.S. 83 (1963), and remanded Paradis' case. The federal district court granted Paradis' habeas petition and ordered the State to initiate a new trial against Paradis or release him. Paradis pled guilty to a lesser charge of accessory to a felony and was released on April 10, 2001.

Following Paradis' release from custody, he filed a notice of tort claim with Kootenai County on October 9, 2001. On April 9, 2003, Paradis filed a complaint in the U.S. District Court for the District of Idaho, naming Dr. Brady, Kootenai County, Walker, Haws, Erbland, and Elliott as defendants, alleging violations of his civil rights, negligence, false arrest, malicious prosecution, false imprisonment, negligent and intentional infliction of emotional distress, and defamation. The defendants filed a number of motions to dismiss, and the federal district court did dismiss a number of claims, but permitted Paradis to file an amended complaint and held that

Paradis had alleged at least some continuing torts that were not barred by statutes of limitation. Paradis filed an amended complaint, naming the same defendants and adding claims for false light and invasion of privacy.

ICRMP was formed in 1985 and sold insurance to its members, including Kootenai County. Beginning in 1986 and continuing through 2001, ICRMP purchased insurance from Northland. Upon receiving a copy of Paradis' initial complaint from Kootenai County in 2003, ICRMP forwarded a copy to Northland. ICRMP also analyzed the initial complaint and, based on the allegations of continuing torts, decided that it had a duty to defend Kootenai County and the individual defendants, subject to exclusions and limitations in ICRMP's policy. ICRMP retained separate counsel for Kootenai County, Haws, Erbland, and Elliott, and Northland did not object. ICRMP managed the Paradis litigation for the next two years, keeping Northland informed of the proceedings, until a settlement was finally reached.[1] On February 13, 2006, Northland first informed ICRMP of its position that coverage did not exist for any of the claims alleged in the Paradis complaints. Northland definitively denied ICRMP's claim for reimbursement of defense and settlement costs on July 20, 2006.

ICRMP filed a complaint and demand for jury trial against Northland on September 14, 2006. The complaint alleged damages for breach of contract based upon Northland's refusal to reimburse ICRMP. ICRMP moved the district court for partial summary judgment asking that the court hold that ICRMP had a duty to defend its Kootenai County insureds; the court granted the motion on May 29, 2007. On March 1, 2007, Northland filed a motion seeking summary judgment that it had no obligation to reimburse ICRMP, which the district court granted on June 11, 2007.

## II. STANDARD OF REVIEW

When reviewing an order for summary judgment, the standard of review for this Court is the same standard used by the district court in ruling on the motion. *Watson v. Weick*, 141 Idaho 500, 504, 112 P.3d 788, 792 (2005). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Idaho R. Civ. P. 56(c).

---

[1] No finding was made in the litigation that Haws, Erbland or any of the other defendants had engaged in wrongful conduct.

A court must first decide, when construing a contract, whether it is ambiguous, which is a question of law. *Lovey v. Regence BlueShield of Idaho*, 139 Idaho 37, 46, 72 P.3d 877, 886 (2003). A contractual provision is ambiguous if it is reasonably subject to conflicting interpretations. *Id.* If the policy at issue does not appear ambiguous on its face, and if neither party asserts that it contains an ambiguity, then this Court exercises free review over its interpretation. *Id.* The meaning of the contract and the intent of the parties must be determined from the plain meaning of the words used. *Id.*

## III. ANALYSIS

### A. Northland is not ICRMP's reinsurer and is liable to ICRMP only according to the terms of Northland's own policy.

ICRMP urges that its decision to extend coverage to the Kootenai County insureds was taken in good faith, as evidenced by the district court's summary judgment holding that ICRMP had a duty to defend against that lawsuit,[2] and that therefore Northland, as ICRMP's reinsurer, must extend corresponding coverage. Northland argues that the policy it sold ICRMP is a reimbursement policy, which does not bind Northland to extend coverage beyond the terms of that policy. The district court, while recognizing that the parties thoroughly discussed this issue of reinsurance versus reimbursement insurance, declined to rule on it, stating that Northland did not request a decision on this issue in its motion for summary judgment. The parties have renewed the discussion before this Court, however, and because the question is a question of law that is before this Court on a motion for summary judgment, it is appropriate for the Court to address it now. *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 189, 108 P.3d 332, 336 (2005).

A reinsurer, in the strict sense of the term, is liable only according to the terms and conditions of the reinsurance contract, and only if the reinsured is liable. 44A Am. Jur. 2d Insurance §1819. However, "[a] 'following form' clause in a policy of reinsurance incorporates by reference all the terms and conditions of the reinsured policy, except to the extent that the reinsurance contract by its own terms specifically defines the scope of coverage differently, i.e., via an exclusion." *Aetna Cas. and Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1328, 1345 (S.D.N.Y.

---

[2] There has been no appeal from the district court's determination that ICRMP had a duty to defend its Kootenai County insureds. Rather, this appeal stems only from the district court's grant of summary judgment holding that Northland is not liable to ICRMP, and our obligation is to decide whether to affirm or reverse that judgment. We do not have the authority to say whether the former ruling was correct as it is not before us for review.

1995). ICRMP argues that the Northland policy is a reinsurance policy that incorporates ICRMP's policy with Kootenai County, and as such, where ICRMP is bound by the terms of its policy, so too is Northland, as a reinsurer, bound to reimburse ICRMP.

ICRMP further argues that Northland, as ICRMP's reinsurer, is also bound by the "follow the fortunes" doctrine, which requires a reinsurer to indemnify the insured for payments reasonably within the terms of the original policy, even if not technically covered by it. *Int'l Surplus Lines Ins. Co. v. Certain Underwriters and Underwriting Syndicates at Lloyd's of London*, 868 F.Supp. 917, 920 (S.D. Ohio 1994). ICRMP argues that even if the defense and settlement costs related to the Paradis litigation were not technically covered by ICRMP's policy, Northland, as a reinsurer, is nonetheless bound to reimburse ICRMP for those costs.

The problem with these arguments is that both the "follow the forms" and "follow the fortunes" rules apply only to reinsurers. Northland is not ICRMP's reinsurer. It is true, as ICRMP points out, that in one instance the Northland policy refers to ICRMP as Northland's "Named Reinsured." However:

> In construing an insurance policy, the Court must look to the plain meaning of the words to determine if there are any ambiguities. This determination is a question of law. In resolving this question of law, the Court must construe the policy "*as a whole, not by an isolated phrase.*"

*Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 141 Idaho 660, 663, 115 P.3d 751, 754 (2005) (quoting *Selkirk Seed Co. v. State Ins. Fund*, 135 Idaho 434, 437, 18 P.3d 956, 959 (2000)) (emphasis added). Aside from this single, isolated appearance of the word "reinsured," there is nothing in the Northland policy to indicate that it is a reinsurance contract. There is no "follow the forms" clause in the Northland policy. There is no other language incorporating the language of the ICRMP policy into the Northland policy. In short, the policies are discrete, and if Northland is at all liable to ICRMP, it can only be by the terms of Northland's own policy. A single instance of the word "reinsurance" will not lead us to import the rules of reinsurance contracts at the expense of the agreement for which the parties bargained. Instead, we look to the express terms of that agreement to determine Northland's liability.

**B. Northland is not liable to reimburse ICRMP because the Paradis complaints do not allege an occurrence under the Northland insurance policy.**

The express terms of the contract make clear that Northland agreed to reimburse ICRMP if an "occurrence" took place during the period ICRMP was covered by the policy. The Northland policy states under Section II that:

> This Section applies only to bodily injury, personal injury or property damage which occur during the policy period and arise out of an occurrence which takes place within the territorial scope of the Policy.

> A – COMPREHENSIVE GENERAL LIABILITY: Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums, including expenses, all as more fully defined by the term ultimate net loss, which the Assured shall become legally obligated to pay as damages imposed by law because of bodily injury, property damage, personal injury, advertising injury, products liability and or completed operations, host/liquor liability or incidental malpractice which result from an occurrence and which occur during the policy period.

> . . .

> C – LAW ENFORCEMENT LIABILITY: Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of errors, omissions or negligent acts arising out of the performance of the Assured's duties while acting as a law enforcement official or officer in the regular course of public employment as hereinafter defined, arising out of any occurrence from any cause on account of Personal Injury, Bodily Injury, Property Damage, Violation of Civil Rights or First Aid, happening during the period of this insurance except as covered under Section II A and B.

The Northland policy defines the term occurrence as follows:

> For Section II, "occurrence" means an accident or happening or event or a continuous or repeated exposure to conditions which result in personal injury or damage to property during the policy period. All personal injuries to one or more persons and/or property damage arising out of an accident or a happening or event or a continuous or repeated exposure to conditions shall be deemed to be one occurrence.

Thus, we must decide whether the Paradis complaints alleged an occurrence as defined by the Northland policy that triggers Northland's liability.

ICRMP advances several arguments as to why Northland's liability under its own policy is triggered by the allegations of tortious conduct contained in the Paradis complaints. ICRMP first contends that the district court, when determining if the Paradis complaints alleged what amounted to an occurrence under the Northland policy, erred by reading the complaints too narrowly. Read broadly, ICRMP argues, the complaints allege at least one potential occurrence

under the Northland policy.  And Northland, ICRMP urges, is liable for the cost to defend and settle even potentially covered, in addition to actually covered, claims because:

> Under Idaho law and consistent with other states, an insurer's duties to defend and indemnify are separate duties. The duty to defend is broader than the duty to indemnify. The duty to defend is triggered if the third-party's complaint reveals a potential for liability that would be covered by the insured's policy.

*Hoyle v. Utica Mut. Ins. Co.*, 137 Idaho 367, 375, 48 P.3d 1256, 1264 (2002) (citations omitted). It is ICRMP's position that, even if the complaints do not allege at least one actual occurrence, they do allege at least one potential occurrence, and such a potential occurrence triggers Northland's duty to defend and thus its liability.

The fault in this first argument is that Northland did not owe a duty to defend.  There is no language in the contract that provides that Northland was obligated to undertake to defend and settle the claims against ICRMP's Kootenai County insureds.  It is true that Northland is liable to reimburse defense costs as specified in the net loss provisions of the policy; however, such liability must first be triggered by an actual occurrence, and then Northland's duty is to pay for ICRMP's defense costs, not to defend ICRMP's insureds.  The fact that Northland could be liable to ICRMP for defense costs resulting from an actual occurrence under the policy does not create in Northland a duty to defend.  Thus, the district court correctly focused on the Paradis complaints to ascertain whether they alleged an actual occurrence under the policy that would trigger Northland's duty to reimburse.

ICRMP next argues that the Paradis complaints do in fact allege at least one actual occurrence that took place during the policy period.  The district court, however, relied on *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3rd Cir. 1982), to determine that they do not.  *Appalachian* involved the question of whether a liability insurer had to provide coverage for losses its insured incurred in the settlement of class action litigation involving sex discrimination in employment where the insured's discriminatory conduct originated before the effective date of coverage but had an impact on class members both before and after that date. The policy at issue defined an occurrence as:

> [A]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period . . .[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

*Id.* at 59.

The *Appalachian* court stated that in order to determine whether there had been an occurrence within the policy period, it had to 1) identify the occurrence and 2) decide when it took place. *Id.* at 61. The court then employed the theory of proximate cause to identify the occurrence, asking if there was but one proximate, uninterrupted, and continuing cause that resulted in all of the injuries and damage. The Court concluded that the occurrence was the company's adoption of discriminatory employment policies. *Id.* The court emphasized that:

> The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause there is a single occurrence. *Champion Int'l. Corp. v. Continental Casualty Co.*, 546 F.2d 502, 505-06 (2d Cir. 1976), cert. denied, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977). Indeed, the definition of the term "occurrence" in the Appalachian policy contemplates that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over a period of time.

*Id.*

Certain of its identification of the single occurrence, the *Appalachian* court next noted that the aspect of the occurrence that must have taken place within the policy period was the result or injury. *Id.* at 61-62. The court observed that the difficulty in the case was that the "injurious effects of [the insured's] . . . employment policies began immediately upon their adoption and continued at least to some extent into the period of coverage provided by the [insurer's] policy." *Id.* at 62. The court held that "in this type of a case the occurrence takes place when the injuries first manifest themselves" and concluded that the time of the occurrence was immediately after the discriminatory policies were promulgated, and thus before the insurance policy at issue had taken effect. *Id.*

The district court in the instant case found that the Kootenai County insureds' alleged failure to disclose exculpatory evidence and to properly train their employees regarding such disclosure was the sole proximate cause of all the damage alleged by Paradis in his complaints. The district court held that, in accordance with both *Appalachian* and *Kootenai County v. Western Cas. and Sur. Co.*, 113 Idaho 908, 750 P.2d 87 (1988), the occurrence took place when the resulting injury first manifested itself, which occurred in 1980 when proceedings against Paradis first began in Idaho. In *Kootenai*, the county argued that even though a sheriff conducted an improper execution sale prior to the date the county purchased an occurrence liability policy

from Lloyd's of London, the insurer should still cover the county's damages resulting from that sale because some of those damages accrued after the policy took effect. 113 Idaho at 915, 750 P.2d at 94. Relying in part on the lower court's decision in *Appalachian*, this Court held that, to the contrary:

> The improper execution sale is not an event covered by the Lloyd's policy since it occurred almost six months prior to the effective date of the policy. An insurer is not liable "for claims arising out of an event or accident which occurred prior to the effective date of the insurance coverage, even though damages and claims continued to accrue from this cause during the later period of coverage."

*Id.* (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Corp.,* 507 F.Supp. 59, 62 (W.D. Pa. 1981) (aff'd, 676 F.2d 56 (3d Cir. 1982)).

ICRMP urges that the district court's conclusion is illogical in light of the fact that the federal district court found that Paradis had alleged continuing torts. The federal court's decision, however, was made in response to a motion to dismiss that was predicated upon statutes of limitations for those torts. And as the district court noted, "it is irrelevant to the analysis whether a claim is preserved for purposes of pursuing the claim." This is because:

> Reliance on the commencement of the statute of limitation is not dispositive in determining when a tort occurs for insurance purposes. Statutes of limitation and triggering dates for insurance purposes serve distinct functions and reflect different policy concerns. Statutes of limitation function to expedite litigation and discourage stale claims. But when determining when a tort occurs for insurance purposes, courts have generally sought to protect the reasonable expectations of the parties to the insurance contract.
> Because of this fundamental difference in purpose, courts have consistently rejected the idea they are bound by the statutes of limitation when seeking to determine when a tort occurs for insurance purposes.

*City of Erie, Pa. v. Guar. Nat. Ins. Co.*, 109 F.3d 156, 161 (3rd Cir. 1997) (citations omitted). The relevant point of focus for determining whether Paradis alleged an occurrence under the policy is the policy itself, and the definition of occurrence in the policy makes clear that continuing torts are considered to be a single occurrence. *Accord Kootenai*, 113 Idaho at 915, 750 P.2d at 94. The policy also makes clear that an occurrence requires a resultant injury, so we consider the time of an occurrence as being when the injurious effect first manifests itself. *Accord Appalachian*, 676 F.2d at 61-62.

ICRMP argues that the Paradis complaints allege both independent and continuing torts that constitute occurrences during the time ICRMP was covered under the Northland policy.

ICRMP began purchasing insurance from Northland in 1986, so any occurrence prior to that would not trigger Northland's liability.

We begin by examining the allegations in Paradis' first complaint. Paradis' first claim alleged that Kootenai County and then Kootenai County Prosecutor Walker failed to train their staff regarding *Brady* disclosure requirements by the time when, in 1981, Paradis became the subject of a criminal investigation and then prosecution by Kootenai County in violation of his constitutional civil rights. The injury from this alleged failure to train manifested itself when Paradis was initially prosecuted in 1980-1981, which occurred prior to the Northland policy period. Allegedly, the initial failure led to the continued withholding of exculpatory evidence and thus continued injury; however, such continued action and ongoing injury arose out of a single occurrence. Thus, under the policy, this claim alleged a single occurrence that took place prior to the policy period, and Northland is not liable for it

In his second claim, Paradis alleged that Kootenai County and Walker failed to train their staff regarding constitutional requirements for probable cause determinations by 1981 when Paradis was arrested, charged, and prosecuted, again in violation of his constitutional rights. This alleged failure and any resulting injury also occurred prior to the Northland policy period.

Paradis' third, fourth, and fifth claims alleged that Kootenai County, the Kootenai County Prosecutor, Walker, Haws, Erbland, Elliott, and Brady were liable for negligence, false arrest, malicious prosecution, and false imprisonment when they "instigated, pursued and prosecuted first degree murder charges against Paradis," and that Walker was negligent in his failure to train his staff regarding *Brady* disclosure requirements and constitutional requirements for probable cause. Paradis' sixth claim alleged that Haws, Elliott, Brady, and perhaps Walker and Erbland conspired to concoct evidence against Paradis and present it as fact in violation of Paradis' civil rights. Paradis alleged in count seven that Brady's conduct that contributed to the conviction against Paradis amounted to negligent or intentional infliction of emotional distress. Again, both the initial event and the resulting injury alleged in these claims occurred, for purposes of the policy, prior to Paradis' conviction in 1981—five years prior to the beginning of the policy period.

Paradis' eighth claim alleged that Brady defamed Paradis "repeatedly" by "perpetuat[ing] the contrived and unsupportable theories" upon which Paradis was convicted, thereby "provid[ing] cover for [Brady's] own transgressions at the continued expense and punishment of

Paradis." Again, albeit continuous, this alleged conduct with its resulting injury occurred prior to Paradis' conviction. Even if this claim could be read as alleging an occurrence, however, because ICRMP did not defend Brady, Northland would still not be liable for his alleged conduct.

Paradis' ninth, tenth, and eleventh claims alleged that conduct by Haws amounted to negligent or intentional infliction of emotional distress and defamation. Specifically, these claims alleged that Haws assisted in suppressing Paradis' subpoena of Haws' 1980-1981 prosecution notes, which Paradis was attempting to obtain for his 1986 habeas corpus petition, and that Haws made false statements about Paradis' guilt throughout his involvement in Paradis' case. The alleged suppression of Paradis' subpoena in 1986 would have been a continuation of Haws' conduct begun in 1980: but for Haws' alleged non-disclosure and subsequent fabrication in 1980, there would have been nothing for Paradis to later subpoena. Similarly, Paradis' complaint specifically alleged that Haws' false statements occurred "*throughout* [Haws'] involvement" in Paradis' case. (Emphasis added). Thus, even those statements alleged to have been made after commencement of the policy period would have been a continuation of those made prior to it. More importantly, even if these claims alleged an occurrence during the policy period, Northland would still not be liable. Haws left the employ of Kootenai County in 1983, two years prior to the start of the policy period, and Northland is not liable for any actions he took after that departure.

The first and second claims of Paradis' amended complaint were the same as those in the original complaint. The third claim of the amended complaint alleged that Walker and Kootenai County failed to train their staff not to fabricate and present fabricated evidence against a defendant, which their staff did, with immediate resulting injury, in 1980-1981. The fourth amended claim alleged Brady and Elliott maliciously prosecuted Paradis in violation of his civil rights. The fifth amended claim alleged all defendants engaged in a pre-arrest conspiracy to fabricate jurisdiction and probable cause. Count six of the amended complaint alleged Elliott violated Paradis' constitutional rights by falsely procuring an arrest warrant. Count seven alleged that Walker and Kootenai County were negligent in training and supervising their staff thereby permitting the wrongful seizure, arrest, and conviction of Paradis. The eighth amended claim alleged that Brady intentionally inflicted emotional distress on Paradis "during the investigatory phase and after his conviction." While the conduct and resulting injury alleged in

these claims may have continued for many years, it all occurred, for purposes of the policy, prior to the time Northland began insuring ICRMP.

The ninth claim in the amended complaint alleged that Brady and Haws portrayed Paradis in a false light and invaded his privacy by comments they made after Paradis' conviction. Specifically, the claim alleged that Brady made statements that corroborated his false testimony at trial and that Haws made statements in 1986 and 1987 that Paradis was guilty of murder. Even though this alleged conduct took place after Paradis' conviction and after the start of the policy period, it was the "product of a malicious fiction" that was initially created with immediate resultant injury in 1980. Thus, the conduct was a continuation of an occurrence that took place prior to the policy period. More importantly, as discussed above, ICRMP did not defend Brady, and Haws left the employ of Kootenai County prior to the policy period. Northland is thus not liable for acts alleged in this claim.

Count ten of the amended complaint alleged that Haws' conduct amounted to negligent and intentional infliction of emotional distress—beginning with his conduct during the "investigatory phase." Count eleven alleged that Elliott and Brady conspired to withhold evidence prior to, during, and after Paradis' trial in violation of his civil rights. Once again, these claims alleged conduct that occurred prior to the policy period.

In short, ICRMP points to both the original and amended complaints for support of its claim against Northland. The complaints, however, failed to allege any action by the Kootenai County insureds with resulting injury that occurred during the period of coverage under the Northland policy. [3] Therefore, we affirm the district court's grant of summary judgment.

## C. Northland is entitled to an award of costs.

Northland has requested an award of costs on appeal pursuant to I.A.R. 40. That rule provides, in relevant part, that "[c]osts shall be allowed as a matter of course to the prevailing party unless otherwise provided by law or order of the Court." As the prevailing party in this appeal, costs are awarded to Northland.

## IV. CONCLUSION

We affirm the district court's grant of summary judgment because the Paradis complaints did not allege an occurrence under the Northland policy. Costs to Northland.

---

[3] We further note that Northland's policy does not cover intentional acts such as those alleged in several of Paradis' claims.

Justice BURDICK and Justices Pro Tem TROUT and KIDWELL **CONCUR**.

J. JONES, Justice, specially concurring.

I fully concur in the Court's opinion, but wish to observe that the opinion relates only to the question of which entity bears the responsibility for payment of costs and expenses incurred in the *Paradis* litigation and does not in any way reflect on the honesty or integrity of the Kootenai County defendants, particularly Marc Haws and Peter Erbland. Were the situation otherwise, I would not have participated in the case because, having worked with both Marc Haws and Peter Erbland, I have full confidence in their honesty, ethics and integrity.